**ATARI GAMES CORPORATION,**
**Appellant,**

v.

**Ralph OMAN, Register of Copyrights, Appellee.**

**No. 91–5326.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 20, 1992.

Decided Nov. 20, 1992.

A. Sidney Katz, with whom James P. White and Laurie A. Haynie, Chicago, Ill., were on the brief, for appellant.

Fred E. Haynes, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Dorothy Schrader, Gen. Counsel, U.S. Copyright Office, William J. Roberts, Atty. Adviser, U.S. Copyright Office, John D. Bates, R. Craig Lawrence, and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before: RUTH BADER GINSBURG, BUCKLEY, and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

This is the replay of the match refereed by this court in *Atari Games Corp. v. Oman*, 888 F.2d 878 (D.C.Cir.1989) (*Atari I*), *reversing* 693 F.Supp. 1204 (D.D.C.1988) (summary judgment that Register of Copyright's refusal to register video game BREAKOUT as an audiovisual work was not an abuse of discretion). In *Atari I*, this court remanded the matter because we were unable to determine what standard the Copyright Office in fact used to deny registration to the audiovisual work before it, i.e., the video game BREAKOUT. *See Atari I*, 888 F.2d at 879 (court's opinion); *id.* at 887 (Silberman, J., concurring in the judgment). The court found the Register's letter refusing registration opaque in four key areas: the standard of creativity; the consideration of the work as a complex whole; the use of the idea/expression dichotomy; and the relevance of the *scènes à faire* doctrine to the issue of copyrightability.

After remand, the Register again refused registration. Reconsideration of "Breakout," Letter Ruling, April 30, 1990 (Letter). The district court again granted summary judgment to the Register. Memorandum Opinion and Order, *Atari Games Corp. v. Oman*, No. 88–21 (D.D.C. Aug. 13, 1991). Testing the Register's disposition only for "abuse of discretion," *see OddzOn Products, Inc. v. Oman*, 924 F.2d 346, 347 (D.C.Cir.1991) (applying the standard set out in 5 U.S.C. § 706(2)(A)), we hold that the rejection of BREAKOUT was unreasonable when measured against the Supreme Court's instruction that "the requisite level of creativity [for copyrightability] is extremely low." *Feist Publications v. Rural Tel. Serv. Co.*, — U.S. —, —, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358, 369 (1991).

## I.

BREAKOUT is a relatively early video game of comparative simplicity. The sound accompaniment is four basic tones. The screen shows the two players' scores at the top. The players move a "paddle" to hit a "ball" against a "wall." The wall is built of eight rows of rectangles arranged in four monochromatic stripes (red, amber, green, yellow). When the square blue ball hits a rectangle, the rectangle vanishes. When the ball breaks through the wall of rectangles to the empty space beyond, it ricochets at greatly increased speed until it reemerges. Both the ball's speed and the size of the rectangular paddle change during play. The ball's movement does not follow the laws of physics; instead, the angle of the ball's rebound depends solely on where it impacts the paddle.

In his second refusal to register BREAKOUT, the Register characterized the representations of the wall, ball, and paddle as "simple geometric shapes and coloring" which "*per se* are not copyrightable." Letter at 3 (citing 37 C.F.R. § 202.1 (1988)).[1] Viewing BREAKOUT "as a whole," the Register found "no original authorship in either the selection or arrangement of the images or their components." *Id.* at 3–4. He therefore refused registration, stating in conclusion that "the display screens both individually and as a whole simply lack[ ] sufficient creativity to make them registerable as audiovisual works." Letter at 5.

## II.

To be copyrightable, a work must be fixed, original (i.e., not copied), and a "work

1. The Letter further observed that the "flat, unadorned geometric shapes" in BREAKOUT "do not evince authorship in the nature of perspective, shading, depth or brushstroke." Letter at 3; *see also id.* at 2 ("If the Copyright Office were to examine a painting consisting entirely of rectangles and find it copyrightable, it is important to understand that this decision would be based on creative elements such as depth, perspective, shading, texture of brushstroke, etc. and not on the geometric shapes per se."). Recalling the creativity of the work of Mondrian and Malevich, for example, we note that arrangement itself may be indicative of authorship. *Cf. OddzOn Products, Inc. v. Oman*, 924 F.2d 346, 348 n. 1 (D.C.Cir.1991) (district court judge asked counsel for the Register, "If Picasso had painted a round object on a canvas, would you say because it depicts a familiar subject—name-

of authorship." 17 U.S.C. § 102; *see Feist,* —— U.S. at —— - ——, 111 S.Ct. at 1287–88 (requirements for copyrightability). The only dispute now presented concerns BREAKOUT's qualification as a "work of authorship," which on statutory and constitutional grounds necessitates a modicum of creativity. *See Feist,* —— U.S. at —— - ——, —— - ——, 111 S.Ct. at 1287–88, 1296–97.[2]

BREAKOUT was presented to the Register as an audiovisual work:

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

17 U.S.C. § 101. In *Atari I,* we inquired whether the Register considered video games, although fitting within the "audiovisual works" category, to require a different level of creativity than other works. *See Atari I,* 888 F.2d at 888 (Silberman, J., concurring). The Register has disclaimed any such approach. He stated that

[t]he Copyright Office is applying the same creativity standard to the video-game "Breakout" as it would to any other type of work, be it a pictorial, graphic, dramatic, musical, or literary work, etc.

Letter at 2; *see also id.* at 1 ("We have applied the generally accepted modest degree of creativity standard[.]").

In *Feist,* decided eleven months after the Register reconsidered BREAKOUT,[3] the Supreme Court extensively discussed and elucidated the creativity standard; the Court left no doubt that the requirement is indeed modest:

[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be.

*Id.,* —— U.S. at ——, 111 S.Ct. at 1287 (quoting M. Nimmer & D. Nimmer (Nimmer), Copyright § 1.08[C][1] ).[4] While enunciating the copyright creativity standard for all works, *Feist* deals with a compilation of facts:

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

17 U.S.C. § 101.

An audiovisual work is, among other requirements, "a series of related images." *Id.* Therefore, as this court pointed out in *Atari I,* 888 F.2d at 883, the interrelationship of the successive BREAKOUT screens is crucial. We can accept the Register's assertion that the individual graphic elements of each screen are not copyrightable. Even so, BREAKOUT would be copyrightable if the requisite level of creativity is met by either the individual screens or the relationship of each screen to the others and/or the accompanying sound effects. *See Stillman v. Leo Burnett Co.,* 720 F.Supp. 1353, 1361 (N.D.Ill.1989) ("synergy of … nonprotectible elements in [television] commercial creates a whole that is greater than the sum of its parts"); *cf. Roth Greeting Cards v. United Card Co.,* 429 F.2d 1106, 1109 (9th Cir.1970) (greeting cards held copyrightable though text standing alone was not; "all elements of each card, includ-

---

ly, something that's round—it can't be copyrighted?").

**2.** The Register's second refusal does not rest on the *scènes à faire* doctrine or idea/expression dichotomy addressed in *Atari I,* 888 F.2d at 884–86.

**3.** Since both parties accept *Feist* as confirming, not changing, prior law, no retroactivity problem is presented.

**4.** A determination of copyrightability, we note, does not mean the holder will prevail against all

copiers or producers of similar works. The scope (strength or "thinness") of the protection is a distinct inquiry. *See Feist,* —— U.S. at ——, 111 S.Ct. at 1289; *see also Frybarger v. International Business Machines Corp.,* 812 F.2d 525, 529–30 (9th Cir.1987) (video game is copyrightable but not infringed; "the mere indispensable expression of these ideas … may be protected only against virtually identical copying") (emphasis deleted); *see generally* Nimmer § 218[H][b] (overview of video games).

ing text, arrangement of text, art work, and association between art work and text, [must] be considered as a whole"). An audiovisual work is analogous to the compilation of facts discussed in *Feist* in this critical respect: both involve a choice and ordering of elements that, in themselves, may not qualify for copyright protection; the author's *selection* and *arrangement,* however, may "entail [the] minimal degree of creativity" needed to bring the work within the protection of the copyright laws. *See Feist,* —— U.S. at ——, 111 S.Ct. at 1289.

*Feist* concerned a white-page telephone directory. The publisher of the directory had taken the names, telephone numbers, and addresses of all persons using its telephone service and arranged the material alphabetically by subscriber's name. This manner of selecting and presenting facts was held not to involve "the modicum of creativity" necessary for copyright protection because the choices and arrangement were "mechanical," "garden-variety," "typical," and "obvious"; the alphabetized list followed "an age-old practice, firmly rooted in tradition," one "so commonplace that it has come to be expected as a matter of course," or as "practically inevitable." *Id.,* —— U.S. at ——, 111 S.Ct. at 1296–97; *cf. Atari Games Corp. v. Nintendo of America, Inc.,* 975 F.2d 832, 840 (Fed.Cir.1992) (relying on factual compilation case to support the existence of "protectable expression" in the "selection and arrangement of ... instruction lines" in a computer program) (citing *Bellsouth Advertising & Pub. Corp. v. Donnelley Info. Pub., Inc.,* 933 F.2d 952, 957 (11th Cir.1991) (post-*Feist* case holding yellow page telephone directory copyrightable)).

When this case was remanded to the Register pre-*Feist,* the circuit's leading decision on authorship based on the arrangement of uncopyrightable elements was *Reader's Digest Ass'n v. Conservative Digest, Inc.,* 821 F.2d 800, 806 (D.C.Cir.1987) (holding magazine cover copyrightable). We anticipated that the Register would "take careful account of" that decision. *Atari I,* 888 F.2d at 883. The *Reader's Digest* panel held that

[n]one of the individual elements of the Reader's Digest cover—ordinary lines, typefaces, and colors—qualifies for copyright protection. But the distinctive arrangement and layout of those elements is entitled to protection as a graphic work.... Reader's Digest has combined and arranged common forms to create a unique graphic design and layout.

*Reader's Digest,* 821 F.2d at 806.

### III.

Our first problem with the Register's Letter rejecting BREAKOUT for a second time is its apparent focus on the individual screens, rather than the flow of the game as a whole. The hallmark of a video game is the expression found in "the entire effect of the game as it appears and sounds," its "sequence of images." *Stern Elecs., Inc. v. Kaufman,* 669 F.2d 852, 857 (2d Cir. 1982); *see also Nintendo of America, Inc. v. Elcon Indus.,* 564 F.Supp. 937, 943 (E.D.Mich.1982) (protectable "expression includes the characters, obstacles and background as well as the sequence of play of the game"); *Midway Mfg. Co. v. Bandai–America, Inc.,* 546 F.Supp. 125, 147 (D.N.J. 1982) (protecting a video game's "play and sequence of images"), *aff'd sub nom. Bandai America, Inc. v. Bally Midway Mfg. Co.,* 775 F.2d 70 (3d Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986).

The Register states that he considered BREAKOUT "as a whole" and as a "series of related images." Letter at 1, 2. However, the sounds were mentioned only in the quoted statutory definition. Letter at 1. The purported discussion of the "movement of the pieces" through the "series of related images" centered invariably on the "images or their components." Letter at 3–4. We are left with the impression that the Register may have so trained his observation on the details of the individual screens that he neglected genuinely to consider the sequential aspect of the work. *Cf. Atari I,* 888 F.2d at 883 (Register may concentrate initially on discrete parts so long as he ultimately bases his decision on "the total sequence of images displayed as

the game is played"). This impression is reinforced by the Register's position on the triviality of the work, a position taken with scant attention to whether any creativity is displayed in the movement of the game pieces.

## IV.

On remand, the Register stated that BREAKOUT was too trivial for protection, Letter at 2; he also repeated the words "distinctive" and "unique" as if they were talismanic. *Id.* at 3, 4 ("[T]he Copyright Office finds no 'distinctive arrangement' or 'unique graphic design' in 'Breakout.'"). The *Reader's Digest* panel, however, did not state that "distinctive" or "unique" qualities were requirements for protection. The opposite is implied by *Reader's Digest*'s long quotation from a case finding protectable a "distinguishable variation in the arrangement and manner of presentation" of public domain elements. *Reader's Digest,* 821 F.2d at 806 (quoting *Amplex Mfg. Co. v. A.B.C. Plastic Fabricators, Inc.,* 184 F.Supp. 285, 288 (E.D.Pa.1960)); *see also Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99, 101, 102 (2d Cir. 1951) ("no considerable uniqueness" is required, merely "a distinguishable variation"). *Feist* and decisions applying *Feist* confirm this reading of *Reader's Digest. See, e.g., Key Publications v. Chinatown Today Pub. Enters.,* 945 F.2d 509, 512–14 (2d Cir.1991) (yellow page telephone directory is copyrightable); *Kregos v. Associated Press,* 937 F.2d 700 (2d Cir.1991) (choice of categories to include in baseball pitching form may be copyrightable); *Bellsouth,* 933 F.2d at 957–58 (yellow page telephone directory is copyrightable).

The Register reported that he reconsidered BREAKOUT under the "generally accepted modest degree of creativity standard." Letter at 1. On brief he contended that "*Feist* confirms the Copyright Office's understanding of the statutory standard of original work of authorship." Brief for Appellee at 21. We do not comprehend, however, how one reconciles *Feist*'s eluci-

dation with the Register's analysis in this case.[5]

Undisputedly, the ball's path in BREAK-OUT varies depending on which of four sections of the paddle it hits. Its trajectory does not follow from the laws of physics. Atari created this motion by selecting and arranging the graphic elements in individual screens and then selecting and arranging the sequence of these screens. The Register does not mention this aspect of the work. The choice of "motion" made for BREAKOUT (and the selection and arrangement of art work subsumed therein) is not understandably characterized as "mechanical," "garden-variety," "typical" or "obvious," or as projecting "age-old practice[s], firmly rooted in tradition and so commonplace that [the combination of elements] has come to be expected as a matter of course," or as "practically inevitable." *See Feist,* —— U.S. at —— – ——, 111 S.Ct. at 1296–97. The assemblage of elements in BREAKOUT does not appear to follow "a convention" that is "purely functional," allowing "no opportunity for variation." *See Victor Lalli Enters. v. Big Red Apple, Inc.,* 936 F.2d 671, 673 (2d Cir.1991) (post-*Feist* decision finding beneath the minimum creativity line the selection and arrangement of horse race results needed to determine winner of illegal numbers games).

In tension with *Feist,* counsel for the Register suggested at oral argument that BREAKOUT's resort to nonrepresentational images shows a lack of creativity. Counsel stated, specifically:

> [T]he idea ... could have been expressed in expressive ways. They could have added graphics to it. They could have had a brick wall that looked like a brick wall. They could have added ivy that was expressive.

Shortly later the Court asked:

> You have a ball that doesn't operate in any standard way, a wall that doesn't

---

5. We note that the district court, in its August 13, 1991 Memorandum Opinion and Order, *see*

*supra* p. 243, did not advert to the Supreme Court's clarifying decision in *Feist.* ..

look like a wall. Those are fanciful elements. Are they not?

To which counsel replied:

I certainly would not agree that the brick wall is a fanciful element because it is not a brick wall. It is simply common symbols that had been run together.

Abstract representation, however, is neither an "obvious" nor an "inevitable" choice. Nor is the coordination of a *square* "ball" and a rectangular *shrinking* paddle a "time-honored" or "conventional" combination. The same may be said of the choice of colors (not the solid red, brown, or white of most brick walls), the placement and design of the scores, the changes in speed, the use of sounds, and the synchronized graphics and sounds which accompany the ball's bounces behind the wall.[6]

We do not in any way question the Register's position that "simple geometric shapes and coloring alone are *per se* not copyrightable." *See* Brief for Appellee at 13. Nor do we hold that all video games are *per se* copyrightable. *Accord Stern Elecs.*, 669 F.2d at 857 (reserving issue). We are mindful, however, of the teaching of *Feist* that "[t]he vast majority of works make the [copyright] grade quite easily." *Feist*, —— U.S. at ——, 111 S.Ct. at 1287.

It is not the Register's task to shape the protection threshold or ratchet it up beyond the "minimal creative spark required by the Copyright Act and the Constitution." *See id.*, —— U.S. at ——, 111 S.Ct. at 1297.

### Conclusion

The rational basis for finding the elements as combined and arranged in BREAKOUT "so commonplace that [they have] come to be expected as a matter of course," *Feist*, —— U.S. at ——, 111 S.Ct. at 1297, eludes us. It is the Register's duty, as it is ours, to heed the unifying and clarifying instruction furnished by the Supreme Court in *Feist*. Therefore, we reverse the summary judgment granted to the Register and remand the case to the district court with instructions to again return the matter of Atari's application to the Register for renewed consideration consistent with this court's opinion.

*It is so ordered.*

---

**6.** We list these features as examples, not as a complete catalog of aspects of BREAKOUT in which one might see "some creative spark." *See Feist*, —— U.S. at ——, 111 S.Ct. at 1287; *see also id.*, —— U.S. at ——, 111 S.Ct. at 1297 (Copyright Act and Constitution require "minimal creative spark").